UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**LEXINGTON**

| | |
|---|---|
| CLAUDE L. BASSETT, | ) |
| | ) Civil Action No. 5:04-425-JMH |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) **MEMORANDUM ORDER & OPINION** |
| THE NATIONAL COLLEGIATE | ) |
| ATHLETIC ASSOCIATION, et al., | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |

** ** ** ** **

Before the Court are several motions brought by the plaintiff, Claude Bassett, and Defendant University of Kentucky Athletic Association ("UKAA"). This order will address UKAA's motion for summary judgment [Record No. 43], UKAA's motion to strike [Record No. 56], Plaintiff's motion under Rule 56(f) [Record No. 68], and UKAA's motion for a protective order [Record No. 86]. As all four motions have been fully briefed, this matter is ripe for review.

**BACKGROUND**

On November 19, 2000, the University of Kentucky's Athletic Director, Larry Ivy, confronted Plaintiff with allegations of impropriety. At the end of their meeting, Ivy told Plaintiff he could either resign and, in exchange, no further action would be taken on the allegations made against him, or face an investigation, potential criminal prosecution, and sure dismissal. Believing that his resignation would end any further inquiry into

his conduct and avoid scandal, Plaintiff resigned.  Plaintiff claims that if he had known the University of Kentucky ("UK") would initiate an inquiry into his conduct, he never would have resigned.

The day after his resignation, on November 20, 2000, UK publicly disclosed that Plaintiff, along with several other assistants in the football program, had been fired.  That day, UK made the decision to conduct an internal investigation of its football program for possible National Collegiate Athletic Association ("NCAA") rules violations.  UK notified the NCAA Enforcement Services of the dismissals and of its intent to investigate.  With the assistance of the Southeastern Conference ("SEC") Commissioner, UK undertook an investigation that lasted through February 2001.

On January 4 and 5, 2001, Plaintiff was interviewed by UK Compliance Officer Sandy Bell, UK General Counsel Dick Plymale, SEC Commissioner Roy Kramer, and SEC investigator Bill Seviers.  UK conducted an internal investigation and submitted the results to the NCAA enforcement staff on February 28, 2001.  In response, on March 30, 2001, the NCAA forwarded a preliminary inquiry to UK. NCAA enforcement staff later issued letters of official inquiry to Plaintiff, UK, and former head football coach Hal Mumme. Plaintiff's counsel responded to the allegations contained in the official inquiry through an October 12, 2001 letter in which he explained that he would be unable to attend the hearing on the

infractions and that the letter would be "his only response to the allegations."  In the letter, Plaintiff stated that he declined to be interviewed by the NCAA because the NCAA would not agree to limit the scope of the interview to pending allegations and would not agree to a telephone interview.  The NCAA released its Infractions Report on January 31, 2002.  The NCAA found that due to Plaintiff's involvement in certain violations of NCAA rules, if Plaintiff seeks employment at any NCAA member school between January 31, 2002 and January 30, 2010, both Plaintiff and the member school shall be requested to appear before the NCAA's infractions committee to consider whether the school should be subject to the NCAA's show cause procedures.

On September 17, 2004, Plaintiff filed a complaint against the NCAA, the SEC, and the UKAA alleging antitrust violations, fraud, civil conspiracy, and tortious interference with prospective contractual relations.  On May 3, 2005, the Court dismissed all of Plaintiff's claims against the SEC and held that only two of Plaintiff's claims survived the UKAA's and the NCAA's motions to dismiss:  Plaintiff's fraud claim against UKAA and Plaintiff's tortious interference with prospective contractual relations claim against the NCAA.

**STANDARD OF REVIEW**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with

the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This burden is met by showing the court that there is an absence of evidence on a material fact on which the nonmoving party has the ultimate burden of proof at trial.  *Id.* at 325.  A fact is material if its resolution will affect the outcome of the lawsuit.  *Waters v. City of Morristown*, 242 F.3d 353, 358 (6th Cir. 2001); *see Pharakhone v. Nissan N. Am., Inc.*, 324 F.3d 405, 407 (6th Cir. 2003) ("If, under the governing law, the outcome would be the same regardless of how a factual dispute is resolved, the dispute is no bar to summary judgment.").  Once the moving party satisfies its burden, the burden then shifts to the nonmoving party to "come forward with some probative evidence to support its claim." *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

When determining whether there is enough evidence to overcome summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, in this case, the plaintiff. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Multimedia 2000, Inc. v. Attard*, 374 F.3d 377, 380 (6th Cir. 2004). The Court must not weigh the evidence, but must decide whether there are genuine issues for trial.  *Anderson*, 477 U.S. at 249.

4

Only material factual disputes will preclude summary judgment, and the dispute must be genuine, that is, the facts must be such that if proven at trial, a reasonable jury could return a verdict for the nonmoving party. *Id.* at 248.

### DISCUSSION

### A.  Plaintiff's Motion for Rule 56(f) Relief

UKAA filed its motion for summary judgment on August 25, 2005. When Plaintiff filed his motion for partial summary judgment on September 12, 2005, which the Court later re-characterized as merely a response to UKAA's motion for summary judgment [Record No. 59], Plaintiff submitted a memorandum opposing UKAA's motion. On October 20, 2005, Plaintiff filed a motion for Rule 56(f) relief.

Federal Rule of Civil Procedure Rule 56(f) provides:

(f) When Affidavits are Unavailable. Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

In *Cacevic v. City of Hazel Park*, 226 F.3d 483 (6th Cir. 2000), the Sixth Circuit explained, "Rule 56(f) has been interpreted as requiring a party making such a filing indicate to the district court its need for discovery, what material facts it hopes to uncover, and why it had not previously discovered the information." *Id.* at 488 (citing *Radich v. Goode*, 886 F.2d 1391,

5

1394 (3d Cir. 1989)).  Contrary to Plaintiff's claim that pursuant to Rule 56(f) he has a right to depose all those involved in the events leading to his ban from college football, Rule 56(f) does not provide Plaintiff with an "absolute right to additional time for discovery," and Plaintiff must "show how postponement of a ruling on the motion will enable him to rebut the motion for summary judgment." *Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d 389, 409 (6th Cir. 1998); *see also Wallin v. Norman*, 317 F.3d 558, 564 (6th Cir. 2003) (stating that "a party invoking Rule 56(f) protections must 'affirmatively demonstrate . . . how postponement of a ruling on the motion will enable him, by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact.'" (quoting *Good v. Ohio Edison Co.*, 149 F.3d 413, 422 (6th Cir. 1998))).  Once there has been a reasonable opportunity for discovery, the party opposing the summary judgment motion must make an affirmative showing of the need for additional discovery. *Emmons v. McLaughlin*, 874 F.2d 351, 356-57 (6th Cir. 1989).

Plaintiff makes the following arguments in support of his motion:  (1) Plaintiff has moved to amend his complaint, (2) Magistrate Judge Todd's October 6, 2005 order granting Plaintiff's motion to use Tony Franklin's deposition was filed after Plaintiff was required to respond to UKAA's motion for summary judgment, thus the order deprived Plaintiff of the use of

Franklin's deposition to oppose UKAA's motion, and (3) the issues raised by UKAA's motion are premature without additional discovery, including allowing Plaintiff to depose Larry Ivy and a UK human resources official.[1]

Additionally, Plaintiff argues that because UKAA's motion for summary judgment asks the Court to weigh the evidence, additional discovery is necessary. As a preliminary matter, the parties do not dictate the standard of review employed by the Court in determining the merits of a summary judgment motion. When assessing whether there is enough evidence to overcome summary judgment, the Court construes the evidence in the light most favorable to the nonmoving party, but it *does not weigh the evidence* in deciding whether there are genuine issues for trial. *Anderson*, 477 U.S. at 249, 255. "[T]he purpose of summary judgment as a procedural device is to allow a court to decide whether any material issues of fact are actually in dispute." *Chilingirian v. Boris*, 882 F.2d 200, 202-03 (6th Cir. 1989).

As to Plaintiff's first argument, in a November 8, 2005 order, the Court denied Plaintiff's motion to amend his complaint. The

---

[1] Plaintiff also argues that additional discovery is necessary as to whether UK has a state mandated duty to report NCAA violations, whether UKAA had a financial incentive to avoid an NCAA investigation, whether "[t]he NCAA Committee on Infractions . . . only punishes coaches based on actual violations," whether Plaintiff "was innocent of the most severe violations that the UKAA self-reported to the NCAA," and whether the NCAA Committee "would have sanctioned [Plaintiff] less severely because of his innocence."

order rendered moot any argument that more discovery was needed in order to address newly added claims.  Plaintiff's second argument is similarly without merit.  In his order, Judge Todd, cognizant of the UKAA's pending motion for summary judgment, specifically granted "Plaintiff's amended motion to permit him to also use Tony Franklin's deposition that Franklin gave in litigation in Fayette Circuit Court styled *Tony Franklin v. The University of Kentucky, et al.*, Case No. 01-CI-3302, in responding, presumably, to the UKAA's motion for summary judgment."  Plaintiff subsequently filed Tony Franklin's deposition with this Court [Record No. 66].

Plaintiff's claim that more discovery is necessary is unavailing, as he has made no showing that discovery would have disclosed any disputed material facts.  *See Chilingirian*, 882 F.2d at 203.  In its motion for summary judgment, the UKAA argues that Plaintiff cannot present a genuine issue of material fact as to the last two elements of his fraud claims:  (1) whether Plaintiff reasonably relied on Larry Ivy's statement and (2) whether Ivy's alleged misrepresentation proximately caused the NCAA to issue the show cause order.  The Court agrees with the UKAA that Plaintiff's motion asks the Court to allow him to conduct discovery as to Ivy to corroborate Plaintiff's own testimony.  For the purposes of reviewing the UKAA's summary judgment motion, the Court *must* accept Plaintiff's recitation of the facts, that is, that Ivy promised Plaintiff that if he resigned, he would not face further

investigation.  In its motion, the UKAA argues that even if the Court accepts Plaintiff's version of the November 19, 2000 conversation, as it must when deciding the UKAA's summary judgment motion, Plaintiff has not provided any explanation as to how deposing Ivy will lead to facts which are reasonably expected to create a genuine issue as to the final two elements of his fraud claim — reasonable reliance and injury.[2]

Plaintiff argues that he must be allowed to continue with discovery as to (1) UK's state-mandated duty to report NCAA violations; (2) the UKAA's financial incentive to avoid an NCAA investigation; (3) whether "[t]he NCAA Committee on Infractions . . . only punishes coaches based on actual violations;" (4) whether Plaintiff "was innocent of the most severe violations that the UKAA self-reported to the NCAA;" and (5) whether the NCAA Committee "would have sanctioned [Plaintiff] less severely because of his innocence."  Issues (1), (3), (4), and (5) have no bearing on whether Plaintiff's reliance on Ivy's statement that there would be no investigation was reasonable or on whether Ivy's alleged misrepresentation caused the NCAA to issue a show cause order.

---

[2] The Court notes that the UKAA has submitted letters dated July 19, 2005 and September 1, 2005 in which it offered Ivy for deposition on the following dates: August 10, 2005, September 27-28, 2005, October 3, 4, 6, 10, & 12, 2005.  Plaintiff neither mentions these letters nor offers any explanation as to why he has not previously deposed Ivy.  *See Cacevic*, 226 F.3d at 488 (noting that Rule 56(f) has been interpreted as requiring that the party moving for Rule 56(f) relief indicate "why it has not previously discovered the information").

Plaintiff neither explains how additional discovery on the UKAA's financial incentive to avoid an NCAA investigation will allow him to rebut the UKAA's motion for summary judgment nor demonstrates "what material facts [he] hopes to uncover" through discovery. *Cacevic*, 226 F.3d at 488. Furthermore, and as discussed below, any dispute over the UKAA's or Ivy's financial incentive to avoid NCAA sanctions does not raise a genuine issue of material fact as to his claim, and thus, it is no bar to summary judgment.

Plaintiff argues that he must be allowed to depose an unnamed University of Kentucky human resources employee to show that "(a) he could not have been fired for the [Vernon Cooper check cashing] incident and (b) that the UKAA merely threatened to prosecute him for the incident and to investigate him for NCAA rules violations as a pretext to force his resignation." The Court is at a loss to understand how evidence of a conversation that occurred *after* Plaintiff resigned would raise a genuine issue of material fact as to the reasonableness of his reliance on Ivy's November 19, 2000 statement or to whether that alleged misrepresentation caused Plaintiff's injuries.

**B.  UKAA's Motion for Summary Judgment**

UKAA argues that Plaintiff's fraud claim fails because representations as to the future do not constitute actionable fraud. According to the Kentucky Supreme Court, however, "[t]his position obviously ignores the fact that there are exceptions to

10

and limitations on this general rule." *Schroerlucke v. Hall*, 249 S.W.2d 130, 131 (Ky. 1952). "[F]raud may be predicated on promises made without an intention of performance, the gist of which lies not in the breach of the agreement, but in the false representation of an existing intention to do certain things, made for the purpose of inducing another to enter into a contractual relation with him." *Id.* The *Schroerlucke* court explained, "It has been held that even though the representations relate to the future, if they are positively stated in order to induce another to do something and the party making the representations has no intention of performance, such statements may be misrepresentation of facts on which fraud may be predicated." *Id.*

Notwithstanding that exception, the plaintiff must set forth a prima facie claim of fraud under Kentucky law and show that the defendant (1) made a material misrepresentation; (2) which was false; (3) which was known to be false or made recklessly; (4) which was made with inducement to be acted upon; (5) which the plaintiff acted in reliance upon; and (6) which caused the plaintiff injury. *Rivermont Inn, Inc. v. Bass Hotels & Resorts, Inc.*, 113 S.W.3d 636, 640 (Ky. Ct. App. 2003). Plaintiff must establish these six elements of fraud by clear and convincing evidence. *United Parcel Service Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999). Moreover, "where the nonmoving party faces a heightened burden of proof, such as clear and convincing evidence,

11

he must show in opposition to the motion for summary judgment that he can produce evidence which, if believed, will meet the higher standard." *White v. Turfway Park Racing Ass'n*, 909 F.2d 941, 944 (6th Cir. 1990) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)). With respect to reliance, Plaintiff must prove that his reliance on the misrepresentation was reasonable, and in making this determination, the Court should consider Plaintiff's knowledge and experience. *Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1447 (6th Cir. 1993); *Vest v. Goode*, 209 S.W.2d 833, 836 (Ky. 1948).

UKAA, as the movant, must establish that there are no genuine issues of material fact. *Hunley v. DuPont Auto.*, 341 F.3d 491, 496 (6th Cir. 2003). This burden "may be accomplished by demonstrating that the non-moving party lacks evidence to support an essential element of its case." *Id.* Therefore, if the UKAA meets its burden, Plaintiff, in order to survive summary judgment, must present "significant probative evidence" to show that a genuine issue of material fact exists as to each element of his claim. *Id.*

Plaintiff claims that Ivy told him that if he resigned, Ivy would not prosecute and would not turn the situation over to lawyers. According to Plaintiff, Ivy's promise was the UKAA's promise not to investigate Bassett's alleged NCAA rules infractions. Assuming there was a fraudulent misrepresentation by Ivy, Plaintiff is unable to prove reasonable reliance in this case.

Plaintiff has not presented "probative evidence" to show that it was reasonable for him believe that Ivy's statement bound the University to refrain from investigating him.  The first line of Plaintiff's complaint sets the stage for the Court's analysis of reasonable reliance:  "Coach Bassett has been a football coach most of his adult life, primarily coaching college football." (Compl. 1.)  Plaintiff spent twelve years on the coaching staff for Brigham Young University's football team.  In his deposition, though Plaintiff does not remember Brigham Young ever having to report rules violations to the NCAA, Plaintiff states that he was annually apprised of NCAA rules and rules changes.  Plaintiff left BYU to coach for UK in 1994.  Plaintiff testified that as the recruiting coordinator at UK he attended annual meetings at which he would take a test on the NCAA rules.  Plaintiff's own employment contract with the UKAA stated that he could be terminated for violations of NCAA and/or SEC rules.  Plaintiff testified in his deposition that he knew NCAA members schools and coaches had a duty to self-report violations to the NCAA.  Specifically, in Plaintiff's November 15, 2001 letter supplementing his response to the NCAA's official inquiry, Plaintiff explains that, "[i]n hindsight," he does not begrudge Ivy for pursuing the investigation, "since he was probably required under NCAA rules to do so."

In his deposition, Plaintiff admitted that he was aware that coaches who were found in violation of NCAA rules would be subject

to disciplinary action and that member schools were required by the NCAA to report violations.   Plaintiff knew of the duty to report infractions first-hand.   In his deposition, he described how UK Compliance Officer Sandy Bell wrote him up within a year of his arrival at UK for breaking a rule regarding on-campus visits.   He also described how her techniques as a compliance officer were more "zealous" than those of compliance officers at other universities. Plaintiff's admitted experience with Ms. Bell and her methods of policing rules violations shows that his reliance on Ivy to prevent an investigation was not reasonable.

In response, Plaintiff claims that his reliance was reasonable because he thought that Ivy and the UKAA had a vested interest in not reporting the infractions to the NCAA.   Plaintiff has presented evidence of the amount of money that UK's football team generates as proof that it was reasonable for him to rely upon Ivy's statement that he would not initiate an investigation.   According to Plaintiff, the threat of NCAA sanctions and lost revenue would prevent Ivy from investigating the allegations against Plaintiff. Furthermore, Plaintiff argues that because UK has an extensive history of NCAA violations, it was reasonable for him to believe Ivy's promise not to investigate.   Plaintiff describes the atmosphere at UK as both indifferent towards compliance (Bassett Aff. ¶¶ 9-20, Sept. 13, 2005) and overly zealous towards compliance (Bassett Dep. 212:6-25 to 214:1-25, July 5, 2005).   The Court does

14

not weigh this evidence against the evidence submitted by the UKAA. Rather, the Court determines whether Plaintiff has submitted "probative evidence" that a genuine issue of material fact exists as to his claim.

In its analysis, the Court cannot ignore Plaintiff's sixteen years of experience in coaching and recruiting players for NCAA college football teams. Despite Plaintiff's recitation of the recruiting violations that others committed while he served as the recruiting coordinator at UK, Plaintiff's knowledge of the coaches' and the university's obligations to report the infractions leads to the conclusion that he has failed to raise a genuine issue as to the reasonableness of his reliance upon Ivy's statement that Plaintiff's own infractions would not be investigated. According to Plaintiff, Ivy's and the UKAA's desire to avoid NCAA sanctions raises a genuine issue of material fact as to reasonable reliance. This dispute over the existence of a financial incentive to avoid sanctions, however, is no bar to summary judgment. Even if the Court accepts Plaintiff's claim that the UKAA and Ivy wanted to avoid the loss in revenue that may result from NCAA sanctions, in light of Plaintiff's extensive experience as a coach and recruiting coordinator and his admitted knowledge of the university's obligation and the coaches' obligations to self-report NCAA infractions, Plaintiff has not presented evidence upon which a reasonable jury could find in his favor.

In *Moore, Owen, Thomas & Co. v. Coffey*, the Sixth Circuit noted that "[i]t is well established under Kentucky law that 'equity will grant no relief to a complaining party who has means of knowledge of the truth or falsity of representations.'" *Moore*, 992 F.2d at 1447 (quoting *Mayo Arcade Corp. v. Bonded Floors Co.*, 41 S.W.2d 1104, 1109 (Ky. Ct. App. 1931)). "'If the truth or falsehood of the representation might have been tested by ordinary vigilance and attention, it is the party's own folly if he neglected to do so, and he is remediless.'" *Mayo*, 41 S.W.2d at 1109 (citation omitted). Although both *Moore* and *Mayo* dealt with plaintiffs who claimed that they were fraudulently induced into entering into written contracts, the principle is applicable to the case *sub judice*. Plaintiff has explained that Ivy was not the only person responsible for reporting NCAA infractions. For example, UK employed a compliance officer, Sandy Bell, who, as described by Plaintiff, could employ "zealous" methods in investigating and reporting recruiting infractions. Moreover, Plaintiff has submitted Hal Mumme's affidavit, which reveals that Mumme, not Ivy, "[c]oncerned over Ivy's allegations the day before[,] asked Bassett's assistants, individually, if they were aware of any rules violations by Bassett," then compiled a list of those allegations, and "gave the list to Sandy Bell." (Mumme Aff. ¶ 21, June 29, 2005.) In his complaint, Plaintiff explains that he resigned on November 19, 2000, hours after Ivy confronted him with evidence of

16

impropriety.  Plaintiff, in agreeing to resign in exchange for a promise that his alleged NCAA infractions would not be investigated, has presented no evidence that he tested Ivy's promise through the exercise of "ordinary vigilance." *Mayo*, 41 S.W.2d at 1109; *see also Wells v. Huish Detergents, Inc.*, 19 Fed. Appx. 168, 177 (6th Cir. 2001) ("[T]he claimant must be justified in relying upon the representations in the exercise of common prudence and diligence." (citing *Selke v. Stewart*, 86 S.W.2d 83, 87 (Ky. Ct. App. 1935))).  Plaintiff has recounted UK's history of NCAA violations and the severe sanctions that the school received as a result.[3]  Plaintiff has not presented "probative evidence" that his reliance on Ivy's promise that his own violations would not be investigated was reasonable under the circumstances.  In his deposition, Plaintiff described his actions as naive (Bassett Dep. 257:25); but as an individual with years of coaching and recruiting experience at NCAA member schools, Plaintiff cannot claim a lack of experience, only a lack of judgment.

Plaintiff has not raised a genuine issue of material fact as to causation, the final element of Plaintiff's fraud claim.

---

[3] The Court finds that Plaintiff's submission of certain "evidentiary materials" that detail UK's history of NCAA rules infractions are irrelevant to its determination of whether Plaintiff has raised a genuine issue as to reasonable reliance. Plaintiff's own experience and knowledge of NCAA rules, not past infractions by others, contribute to the discussion. As the Court will grant UKAA's motion for summary judgment, UKAA's pending motion to strike [Record No. 56] is denied as moot.

Plaintiff claims he was injured by Ivy's misrepresentation because (1) Ivy's statement forced him to resign and to deprive himself of the due process guaranteed under his employment contract and (2) Ivy's misrepresentation led to a UK investigation, the results of which the NCAA relied upon in issuing its eight-year show cause order.   Plaintiff's primary argument is that if UK had not investigated the allegations that he violated NCAA rules, that is, if Ivy had held up his end of their bargain, the NCAA would not have issued an eight-year show cause order to penalize Plaintiff for those rules infractions.[4]   Although Plaintiff made various admissions on television programs and in interviews, his admissions of guilt in his letters to the NCAA and in his deposition are crucial to the Court's inquiry as to causation.   Plaintiff's own statements eliminate the existence of a genuine issue of material fact as to causation.  *See Anderson*, 477 U.S. at 248 (holding that an issue of material fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").   These letters were the only response that the NCAA received from Plaintiff after it sent him an official letter of inquiry on August 3, 2001.   In his October 12, 2001 letter, Plaintiff "admit[ted] to many of the factual allegations detailed in the Official Inquiry, though he vehemently disagree[d] with many

---

[4] The Court notes that Plaintiff, in crafting his argument, fails to mention another possible scenario:  If Plaintiff had not violated any NCAA rules, the NCAA would not have punished him.

18

of the conclusions drawn from these allegations as to the purpose or intent behind his actions." The letter is rife with admissions of guilt for "his own misdeeds," "his mistakes" and "[his] recruiting improprieties." Plaintiff described the "true measure" of his cooperation as "his willingness to admit his mistakes beginning with his first meeting with UK Athletic Director Larry Ivy and still today." Acknowledging his responsibility for his own actions and those of his staff, Plaintiff admitted to "creating an environment where the letter and spirit of NCAA and UK recruiting rules were not followed."[5]

When asked in his deposition if he committed NCAA violations, Plaintiff stated, "Yes, I did. I am also being given by the NCAA rubber stamping a report by the University of Kentucky, things that I did not do." (Bassett Dep. 273:5-8.) Essentially, Plaintiff argues that Ivy's statements forced him to resign, which in turn deprived him of the due process protections that he should have received as a state employee, which in turn led to an investigation

---

[5] In his November 15, 2001 letter, Plaintiff supplemented his earlier response to warn the NCAA that "he was unable to adequately defend himself during UK's self-investigation, as investigators were not forced to follow the same rules required of NCAA investigators." Contrary to his statement in his October 12, 2001 letter in which Plaintiff explains that on November 19, 2000, "[he] admitted to the allegations on the spot and agreed to resign in the best interest of UK football," in his November letter, Plaintiff claims that he "resigned for one reason and one reason only: he was led to believe that his resignation would end further inquiry into his conduct" — conduct that one month earlier he described as violative of NCAA regulations.

that UK did not conduct in the same manner that the NCAA conducts investigations, which in turn led to a report by UK that the NCAA relied upon when deciding whether to issue the show cause order.

Despite his efforts, the Court finds that Plaintiff has not presented evidence upon which a reasonable jury could return a verdict in his favor.  "Kentucky common law firmly incorporates the doctrine that remoteness of injury constitutes a bar to a fraud claim."  *Kentucky Laborers Dist. Council Health & Welfare Trust Fund v. Hill & Knowlton, Inc.*, 24 F. Supp. 2d 755, 762 (W.D. Ky. 1998).  Throughout his deposition and in his letter to the NCAA, Plaintiff admits that his career of college coaching was finished when he, not Ivy, "broke the code of silence."  If Plaintiff believed that the NCAA was relying upon a "tainted" UK report or that Plaintiff was deprived of proper due process protections during UK's investigation, he was afforded several opportunities, only one of which he seized upon, to explain these circumstances to the NCAA, including appearing at the NCAA hearing on his infractions, submitting to an NCAA interview, and responding by letter to the NCAA's inquiry.  Whatever connection arguably existed between Ivy's misrepresentation and the NCAA's decision to issue a show cause order was severed by Plaintiff's own admissions that he had violated NCAA rules.[6]

---

[6] Plaintiff has consistently ignored the breadth of NCAA violations described in the NCAA's report.  Throughout this litigation, Plaintiff has focused on his November 19, 2000 meeting

Plaintiff argues that the allegations in his complaint can be construed as raising a claim for breach of contract.  The Court agrees with UKAA, however, that any agreement entered into by Plaintiff and Ivy in which they decided that they would breach their duties of loyalty to their employer[7] and ignore their obligations to the UKAA and the NCAA[8] by not reporting the allegations of Plaintiff's impropriety would be unenforceable.  In *Commonwealth v. Whitworth*, 74 S.W.3d 695 (Ky. 2002), the Kentucky Supreme Court repeated the well-established principle that "a contract is void *ab initio* if it seriously offends law or public

---

with Ivy, at which they discussed Plaintiff's payment of $1400.00 to a Memphis high school coach and Plaintiff's actions regarding a $500.00 check made out to the university.  The Court will not recite the numerous violations found by the NCAA, but only pauses to note that the NCAA charged Plaintiff with involvement in thirty-five violations, twenty-five of which he admitted to in his October 12, 2001 response to the NCAA's official inquiry.

[7] *See Shamrock Coal Co. v. Taylor*, 697 S.W.2d 952, 954 (Ky. Ct. App. 1985) (holding that "an employer is entitled to the faithful and obedient service of his employee, and that failure to render same may constitute misconduct by the employee"); *Hoge v. Kentucky River Coal Corp.*, 287 S.W. 226, 227 (Ky. Ct. App. 1926) ("Everyone — whether designated agent, trustee, servant or what not — who is under contract or other legal obligation to represent or act for another in any particular business or for any valuable purpose must be loyal and faithful to the interest of such other in respect to such business or purpose.").

[8] Plaintiff admitted that he was aware of his duty as UK's assistant coach to self-report infractions. (Bassett Dep. 46:25.)  *See also DSG Corp. v. Anderson*, 754 F.2d 678, 682 (6th Cir. 1985) ("A fiduciary is further obligated to disclose to his employer any information, gained from whatever source, which could damage the corporation." (citing *Aero Drapery of Kentucky, Inc. v. Engdahl*, 507 S.W.2d 166, 169 (Ky. 1974))).

21

policy." *Id.* at 700 (citing Black's Law Dictionary 1568 (7th Ed.1999)). In *Jackson Purchase Rural Electric Co-op. Association v. Local Union 816, International Brotherhood of Electrical Workers*, 646 F.2d 264 (6th Cir. 1981), the Sixth Circuit, in examining whether a company's illegal practice of checking off union dues "may nonetheless be enforced by an arbitrator as part of a collective bargaining agreement," referred to the Restatement (Second) of Contracts § 320(1), which states that "a promise is unenforceable if legislation so provides, or if the interest in enforcement is clearly outweighed by the public policy against enforcement." *Id.* at 267. "Generally, one who has himself participated in an illegal act cannot be permitted to assert in a court of justice any right founded upon or growing out of the illegal transaction." *Id.*

Plaintiff contends that Ivy's promise did not violate public policy because the NCAA rules are not criminal statutes, the NCAA is not a governmental body, and the NCAA issues "rules that its members may choose to follow or not." (Pl.'s Resp. to UKAA's Mot. for Summ. J. 7.) In *National Collegiate Athletic Association v. Tarkanian*, 488 U.S. 179 (1988), the Supreme Court stated, "NCAA legislation applies to a variety of issues, such as academic standards for eligibility, admissions, financial aid, and the recruiting of student athletes. By joining the NCAA, each member agrees to abide by and to enforce such rules." *Id.* at 183. Based

22

on his deposition testimony, Plaintiff agrees with that statement and concedes that he, Ivy, Mumme, and UK were all obligated to follow NCAA rules and self-report NCAA infractions.

Contracts that require an employee to breach his fiduciary duty to his employer are illegal and void under Kentucky law. *In re Big Rivers Elec. Corp.*, 233 B.R. 726, 736 (Bankr. W.D. Ky. 1998) (citing *Kessler v. Jefferson Storage Corp.*, 125 F.2d 108, 110 (6th Cir. 1941) (finding that "such agreements are against the public policy of securing faithful discharge of duties by persons holding positions of trust and confidence, . . . agreements tending to cause unfaithful conduct by fiduciaries are illegal because they are, in effect, agreements to wrong or defraud persons whose interest the fiduciaries have in charge" (citations omitted)). Plaintiff's own employment contract required that he follow NCAA and SEC rules.  Through his interviews with the media, his interview with UKAA and SEC officials, his letters to the NCAA, and his deposition in this case, Plaintiff has consistently admitted that he violated UK's obligation, and his own obligation, to comply with NCAA rules.  As in *Jackson*, there is no specific public interest in enforcing an agreement between Ivy and Plaintiff to ignore his illicit behavior.  "Rather, the public's interest is promoted by non-enforcement." *Jackson*, 646 F.2d at 267.[9]

---

[9] Plaintiff argues in the alternative that even if the promise were unenforceable as a contract, he could still enforce the promise as fraud.  As set forth in the discussion above, the Court

23

## CONCLUSION

In sum, this Court refuses to condone Plaintiff's ludicrous efforts to bind the UKAA to agree to breach its obligations to the NCAA and conceal Plaintiff's numerous rules infractions.  As the Court will grant UKAA's motion for summary judgment, the pending motion for a protective order, seeking a delay of the depositions pending a ruling on the dispositive motion [Record No. 86], is therefore denied as moot.

Accordingly, and for the foregoing reasons, **IT IS ORDERED:**

(1) UKAA's motion for summary judgment [Record No. 43] be, and the same hereby is, **GRANTED;**

(2) UKAA's motion to strike [Record No. 56] be, and the same hereby is, **DENIED AS MOOT;**

(3) Plaintiff's motion under Rule 56(f) [Record No. 68] be, and the same hereby is, **DENIED;** and

(4) UKAA's motion for a protective order [Record No. 86] be, and the same hereby is, **DENIED AS MOOT.**

This the 18th day of April, 2006.



Signed By:

_Joseph M. Hood_

United States District Judge

---

has already determined that Plaintiff has not raised a genuine issue of material fact as to reasonable reliance or causation and thus cannot survive the UKAA's motion on his fraud claim.

24