```
                     UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF KENTUCKY
```
                              **LEXINGTON**

CLAUDE L. BASSETT,                )
                                  )
                                  )  Civil Action No. 5:04-425-JMH
     Plaintiff,                   )
                                  )
v.                                )
                                  )
THE NATIONAL COLLEGIATE           )  **MEMORANDUM OPINION & ORDER**
ATHLETIC ASSOCIATION, et al.,     )
                                  )
                                  )
     Defendants.                  )

                       **    **    **    **    **

Before the Court are Defendant National Collegiate Athletic Association's ("NCAA") motions for summary judgment [Record No. 95] and for a protective order [Record No. 86]. Plaintiff Claude Bassett has responded to these motions [Record Nos. 106 & 92, respectively]. The NCAA has replied to Plaintiff's response to its summary judgment motion [Record No. 110]. Also pending before the Court is Plaintiff's motion to strike certain exhibits submitted by the NCAA in support of its dispositive motion [Record No. 111], to which the NCAA has responded [Record No. 116]. The Court being sufficiently advised, this matter is ripe for review.

                              **BACKGROUND**

On November 19, 2000, Plaintiff resigned from his position as assistant coach of the University of Kentucky's ("UK") football team. Earlier that day, UK's Athletic Director, Larry Ivy, confronted Plaintiff with allegations of impropriety. At the end of their meeting, Ivy presented Plaintiff with a choice of two

options: (1) resign and, in exchange, no further action would be taken on the allegations made against him, or (2) face an investigation, potential criminal prosecution, and sure dismissal. Plaintiff chose to resign and now claims that if he had known UK would initiate an inquiry into his conduct, he never would have made that choice.[1]

On January 4 and 5, 2001, UK Compliance Officer Sandy Bell, UK General Counsel Dick Plymale, Southeastern Conference ("SEC") Commissioner Roy Kramer, and SEC investigator Bill Seviers interviewed Plaintiff as part of UK's internal investigation of NCAA rules violations. UK submitted the results of this investigation to the NCAA enforcement staff on February 28, 2001. NCAA enforcement staff issued letters of official inquiry to Plaintiff, UK, and former head football coach Hal Mumme. In response to the allegations contained in the official inquiry, Plaintiff's counsel sent a letter to the NCAA on October 12, 2001. Plaintiff explained that he would be unable to attend the hearing on the infractions and that the letter would be "his only response to the allegations." In the letter, Plaintiff stated that he declined to be interviewed by the NCAA because the NCAA would not agree to limit the scope of the interview to pending allegations

---

[1] The Court's Memorandum Opinions and Orders of May 3, 2005, and April 18, 2006, provide more detailed summaries of the facts surrounding Plaintiff's resignation and UK's investigation into his actions.

and would not agree to a telephone interview. The NCAA released its Infractions Report on January 31, 2002. The NCAA found that due to Plaintiff's involvement in certain violations of NCAA rules, if he seeks employment at any NCAA member school between January 31, 2002 and January 30, 2010, both he and the member institution shall be requested to appear before the NCAA's infractions committee to consider whether the institution should be subject to the NCAA's show cause procedures. According to Plaintiff, this show cause order "render[ed him] unemployable as a college coach even beyond the ban." (Compl. ¶ 1.)

On September 17, 2004, Plaintiff filed a complaint against the NCAA, the SEC, and the University of Kentucky Athletic Association ("UKAA") alleging antitrust violations, fraud, civil conspiracy, and tortious interference with prospective contractual relations. On May 3, 2005, the Court dismissed all of Plaintiff's claims against the SEC and held that only two of his claims survived the UKAA's and the NCAA's motions to dismiss: Plaintiff's fraud claim against the UKAA and Plaintiff's tortious interference with prospective contractual relations claim against the NCAA.[2] Recently, on April 18, 2006, the Court granted the UKAA's motion

---

[2] Dismissal of Plaintiff's antitrust claims eliminated federal question jurisdiction under 28 U.S.C. § 1331. Because complete diversity exists between Plaintiff, a citizen and resident of Texas, and Defendant, a citizen of Indiana for diversity purposes, and the amount in controversy requirement has been met, jurisdiction is proper under 28 U.S.C § 1332.

3

for summary judgment on Plaintiff's fraud claim.

## STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This burden is met by showing the court that there is an absence of evidence on a material fact on which the nonmoving party has the ultimate burden of proof at trial. *Id.* at 325. A fact is material if its resolution will affect the outcome of the lawsuit. *Waters v. City of Morristown*, 242 F.3d 353, 358 (6th Cir. 2001); *see Pharakhone v. Nissan N. Am., Inc.*, 324 F.3d 405, 407 (6th Cir. 2003) ("If, under the governing law, the outcome would be the same regardless of how a factual dispute is resolved, the dispute is no bar to summary judgment."). Once the moving party satisfies its burden, the burden then shifts to the nonmoving party to "come forward with some probative evidence to support its claim." *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party

will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

When determining the merits of a summary judgment motion, "the evidence, all facts, and any inferences that may be drawn from the facts must be viewed in the light most favorable to the nonmoving party." *Landham v. Lewis Galoob Toys, Inc.*, 227 F.3d 619, 622 (6th Cir. 2000); *see Multimedia 2000, Inc. v. Attard*, 374 F.3d 377, 380 (6th Cir. 2004). The Court must not weigh the evidence, but must decide whether there are genuine issues for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252. Although the disputed issue need not be "resolved conclusively in favor of the nonmoving party," Plaintiff, as the nonmoving party in this case, "must present significant probative evidence that makes it necessary to resolve the parties' differing versions of the dispute at trial." *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987) (citation omitted). In this diversity case, the Court applies state substantive law to Plaintiff's tortious interference with prospective contractual relations claim. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

## DISCUSSION

### A. The NCAA's Motion for a Protective Order

The NCAA has moved the Court for a protective order to block

Plaintiff's deposition of its president, Myles Brand. The NCAA states that "Mr. Brand did not become President of the NCAA until January 1, 2003," after the NCAA had completed its investigation into Plaintiff's conduct, after the NCAA had issued its Public Infractions Report, and "after the Infractions Appeals Committee upheld the show cause penalty." According to the NCAA, Mr. Brand "had no involvement whatsoever in any aspect of the investigation of UK and Bassett." In his response, and for the first time in this litigation, Plaintiff claims that there is a "connection" between criminal prosecutions in Memphis, Tennessee, which were carried out during Mr. Brand's tenure, and Plaintiff's NCAA enforcement proceedings.

Plaintiff concedes that "NCAA executives normally do not participate in the rules enforcement process," and he deposed five NCAA representatives — James Elworth, David Price, Thomas Yeager, Josephine Potuto, and Jerry Parkinson — who actually participated in the rules enforcement process that led to his show cause order. Given that Mr. Brand is a high level executive who did not participate in the investigation of Plaintiff's conduct or in the issuance of the penalty against him, it does not appear that the deposition of Mr. Brand is reasonably calculated to lead to the discovery of admissible evidence as to Plaintiff's remaining claim, tortious interference with prospective contractual relations for imposing a show cause order on January 31, 2002 — nearly one year

6

before Mr. Brand began his tenure as NCAA president.[3] As the Court will grant the NCAA's motion for summary judgment, the pending motion for a protective order is denied as moot.

**B. The NCAA's Motion for Summary Judgment**

Plaintiff contends that the NCAA has intentionally and improperly interfered with his prospective contractual relations by issuing an eight-year show cause order which effectively forbids its members to hire him. According to Plaintiff, UK's investigation and subsequent self-report to the NCAA was based upon evidence gathered through deceit. Because Plaintiff was not afforded due process during UK's investigation, the NCAA's reliance upon UK's self-report led to an unjust punishment.

Kentucky has adopted the tort of tortious interference with prospective contractual relations from Restatement (Second) of Torts § 766B, which provides:

> One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of
> (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or
> (b) preventing the other from acquiring or continuing the

---

[3] *See Lewelling v. Farmers Ins. of Columbus, Inc.*, 879 F.2d 212, 218 (6th Cir. 1989) (deferring to the district court's "broad discretion" to manage its case and finding that the court did not abuse its discretion by granting a motion for a protective order based, in part, on the moving party's representation that the proposed deponent "had no knowledge as to facts pertinent to plaintiffs' action").

prospective relation.

Restatement (Second) of Torts § 766B (1979); *see Nat'l Collegiate Athletic Ass'n v. Hornung*, 754 S.W.2d 855, 857 (Ky. 1988). "[A] party may not recover under [this tort] in the absence of proof that the opposing party 'improperly' interfered with his prospective contractual relation." *Hornung*, 754 S.W.2d at 858. To determine whether an actor's interference is improper, Kentucky courts employ several factors:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties.

*E. Ky. Res. v. Arnett*, 892 S.W.2d 617, 619 (Ky. Ct. App. 1995) (quoting Restatement (Second) of Torts § 767 (1979)); *see also Cullen v. S.E. Coal Co.*, 685 S.W.2d 187, 190 (Ky. Ct. App. 1983) (considering several criteria, including the actor's motive, "the interest that it is trying to advance or protect, the nature of its conduct, the means used to interfere, and whether or not the interference was based upon malice," before reaching its conclusion on improper interference). The *Hornung* court held that in order to prevail, "a party seeking recovery must show malice or some significantly wrongful conduct" and noted that "malice may be inferred in an interference action by proof of lack of justification." *Hornung*, 754 S.W.2d at 859.

8

The NCAA issued a show cause order that Plaintiff claims effectively prohibits its members from employing him as a college football coach. To resolve this motion for summary judgment, the Court must decide if a genuine issue of material fact exists over whether the NCAA acted improperly in issuing this show cause order. Again, Plaintiff's primary argument rests upon his theory that because the NCAA relied upon UK's tainted investigation and report and failed to listen to the recordings of the January 2001 UK/SEC interview, the NCAA improperly issued a show cause order.

Several courts have recognized the NCAA's role in college athletics.[4] The NCAA argues that its issuance of a show cause order was entirely proper because, in order to uphold the purposes of its association, it must be allowed to enforce its rules by penalizing violators. Both UK and Plaintiff had agreed to abide by the NCAA's regulations and to report any possible violations to the NCAA. Defending its decision, the NCAA explains that Plaintiff's

---

[4] *See Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 183 (1988) ("[The NCAA has] adopted rules, which it calls 'legislation,' governing the conduct of the intercollegiate athletic programs of its members. This NCAA legislation applies to a variety of issues, such as academic standards for eligibility, admissions, financial aid, and the recruiting of student athletes." (citation omitted)); *Nat'l Collegiate Athletic Ass'n v. Lasege*, 53 S.W.3d 77, 85 (Ky. 2001) ("The NCAA unquestionably has an interest in enforcing its regulations and preserving the amateur nature of intercollegiate athletics."); *Nat'l Collegiate Athletic Ass'n v. Jones*, 1 S.W.3d 83, 85 (Tex. 1999) ("The NCAA is a voluntary, unincorporated association of colleges and universities created for the stated purpose of preserving the proper balance between athletics and scholarship in intercollegiate sports.").

admissions that he violated numerous NCAA rules, not any impropriety on the part of its association, led to the issuance of the show cause order. The NCAA notes that Plaintiff refused to attend the hearing on his infractions and refused to submit to an interview unless the NCAA agreed to his conditions. Plaintiff responded to the NCAA's official inquiry in an October 12, 2001, letter in which he admitted many of the violations levied against him. In his November 15, 2001, letter supplementing that response, Plaintiff claimed that UK's investigation of Plaintiff was carried out without due process and he requested that the NCAA take into account the manner in which the evidence of his misconduct was obtained when making its determination. Fully aware of Plaintiff's objections to UK's investigation, the NCAA issued its show cause order. The NCAA defends this order and contends that its determinations as to Plaintiff's misconduct are entitled to "a presumption of correctness — particularly when they stem from conceded violations of NCAA regulations." *Lasege*, 53 S.W.3d at 85. Stating that Plaintiff has not presented any evidence that the NCAA's actions were improper or unjustified, the NCAA asks that summary judgment be granted in its favor.

In his response, Plaintiff chastises the NCAA for structuring its enforcement program to "encourage schools to push all blame upon [their] employees for rules violations" and for allowing UK to "railroad the coach through its self-investigation." Plaintiff

claims that because the NCAA rewards institutions that voluntarily disclose violations, an institution could improve its chances of receiving a lesser penalty if it blames the violations on "a clandestine, single employee." By not listening to the tapes of his January 2001 interview, Plaintiff argues, the NCAA only heard UK's explanation of the interview and not Plaintiff's. Acknowledging that his letters to the NCAA apprised the association of UK's mistreatment of him, Plaintiff faults the NCAA because it "could have taken steps to rectify the harm done by UK's investigation." Plaintiff refers the Court to his earlier response to the UKAA's motion for summary judgment for "details of the lies and other deceptions" perpetrated by UK in its investigation.

Viewing the evidence presented and drawing all reasonable inferences in favor of Plaintiff, the Court cannot conclude that he has raised a genuine issue of material fact as to the impropriety of the NCAA's action. To thoroughly assess the NCAA's conduct, the Court will consider several of the factors listed by Restatement (Second) of Torts § 767 and cited with approval by Kentucky courts.

1. *The nature of the actor's conduct.* It is undisputed that the NCAA has the right to enforce its rules among its member institutions. Plaintiff agreed to comply with NCAA rules when he signed his yearly employment contract. In his deposition, David Price, Vice President of the NCAA's Enforcement Services, explained why the NCAA requires its member institutions to self-report rules

infractions: "[W]e want an environment where the institutions try to do the right thing. . . . I believe the institutions are very concerned about their integrity, and this is one area where their integrity can be tested." (Price Dep. Jan. 18, 2006, 22:12-21.) Josephine Potuto, Professor of Law at the University of Nebraska College of Law and a member of the NCAA's Committee on Infractions, conceding that there is no specific NCAA bylaw that requires university officials to be evenhanded and fair in the way they conduct investigations, explained that the NCAA's "cooperative principle" in Bylaw 19 requires member institutions and staff members to cooperate with the NCAA and to provide information to the Committee. (Potuto Dep. Jan. 19, 2006, 27:17-23.) Professor Potuto stated that although the Committee is concerned about whether member institutions are truthful in their self-reports, self-policing is an important part of the enforcement process because the NCAA "is a private association created and comprised of the institutions, and the institutions bear the first and probably the heaviest burden to get things right on campus and do things appropriately." (*Id.* 31:10-13.) Knowing Plaintiff's concerns about the way in which UK investigated his actions and sharing those concerns about truthfulness in self-policing, the NCAA nonetheless chose to rely upon the findings in UK's report over Plaintiff's stated objections. Plaintiff ignores the fact that the NCAA conducted its own interviews as part of its own investigation

12

into Plaintiff's and UK's conduct, which resulted in penalties for UK as well. Plaintiff does not provide any evidence that the NCAA acted improperly by following its established procedure of relying upon a member institution to self-report violations of NCAA rules.

    2. *The actor's motive*. The Texas Supreme Court offered this description of what motivates the NCAA's actions in general: "Among other things, the NCAA promulgates rules and regulations to prevent any member institution from gaining an unfair competitive advantage in an athletic program." *Jones*, 1 S.W.3d at 85. The NCAA issued the show cause order to penalize Plaintiff for violating its rules. In fact, Plaintiff's October 12, 2001, letter to the NCAA reveals that he knew why the NCAA was taking action against him: "[Plaintiff] understands and accepts that the Committee on Infractions has no choice but to punish him for his actions." Plaintiff has offered no evidence that the NCAA's decision was motivated by an illicit or improper motive.

    3. *The interests of the other with which the actor's conduct interferes*. Plaintiff claims that the show cause order forbids NCAA member institutions from hiring him. Although Plaintiff has stated several times that he knew his career in college football had ended when he publicized his activities, the Court acknowledges the severity of the show cause order. The Court also notes, however, Plaintiff's efforts to defend his interests. Well aware of the sanctions that the NCAA could impose upon him, Plaintiff

13

admits that he chose to protect his interests by lying to UK and SEC investigators, admitting to several violations, and denying others.  When given the opportunity to argue in favor of his interests through an NCAA hearing and an interview, however, Plaintiff chose not to participate.  Plaintiff's failure to take advantage of these opportunities weighs against him.

    4. *The interests sought to be advanced by the actor*.  The NCAA is a voluntary association of over 1200 public and private colleges and universities that enacts legislation to govern college athletics. As noted, the NCAA enforces its rules to advance its legitimate interest in regulating athletics at its member institutions.  The show cause order serves to penalize Plaintiff for his rules infractions by making it more difficult, if not impossible according to Plaintiff, to obtain employment at a member institution.  Such an order also advances the NCAA's interests by serving as a deterrent to other individuals who may consider violating NCAA regulations.

    5. *The social interests in protecting the freedom of action of the actor and the contractual interests of the other*.  One of the NCAA's stated purposes evidences society's interest in allowing it to enforce its rules:  "A basic purpose of this Association is to maintain intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of the student body and, by so doing, retain a clear line of demarcation

between intercollegiate athletics and professional sports." (NCAA Constitution, Art. 1.3.) The NCAA's bylaws on recruiting inducements, academic fraud, and ethical conduct, for example, clearly reflect society's general interests in promoting fairness, honesty, and morality. The Court cannot envision how society would be served by allowing an individual who admittedly violated numerous NCAA rules to re-enter the college coaching field.

6. *The relations between the parties*. As a seasoned college coach, Plaintiff knew of UK's obligation and his own obligation to self-report violations to the NCAA and knew that the NCAA could issue penalties in response to those violations. Plaintiff agreed to abide by the NCAA's rules as an assistant coach at UK. His employment contract clearly states that he could have been terminated for "violations of NCAA and/or SEC rules." In his deposition, Plaintiff testified that he attended programs that apprised him of rule changes. In sum, Plaintiff, with his years of experience coaching at two NCAA member institutions, was intimately aware of the NCAA's rules and the consequences of breaking them.

Taking all of these factors into account, the Court finds that Plaintiff has not shown that the NCAA acted improperly when it issued its show cause order. After Plaintiff conceded that he violated the NCAA's rules on recruiting inducements, impermissible tryouts, falsification of recruiting records, and unethical conduct, the NCAA was justified in enforcing those rules through a

15

show cause order. Plaintiff had agreed to comply with those rules, and the NCAA exercised its right to enforce its rules by sanctioning him. Throughout this litigation, Plaintiff has blamed others for his misfortune and never acknowledged how evidence of his own impropriety, including his admissions that he violated NCAA regulations, influenced the NCAA's decision. To prevail, Plaintiff must show that the NCAA's actions were improper; Plaintiff has failed to do so and the NCAA has offered substantial evidence that it was justified in issuing the show cause order.

**C. Plaintiff's Motion to Strike**

Finally, Plaintiff requests that the Court strike Exhibits C-D and F-J to the NCAA's motion for summary judgment.[5] Essentially, Plaintiff's motion asks the Court to ignore these exhibits when deciding the NCAA's dispositive motion because they do not meet the requirements of Federal Rule of Civil Procedure 56(e). Plaintiff claims that these exhibits are unauthenticated and replete with hearsay. *See* Fed. R. Civ. P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth

---

[5] Plaintiff objects to the following exhibits: Exhibit C, University of Kentucky Internal Investigation and Self-Report to NCAA; Exhibit D, Appendix, Case Chronology from NCAA's Public Infractions Report; Exhibit F, January 31, 2002 NCAA Public Infractions Report; Exhibit G, September 1, 2002, Report of the NCAA Division I Infractions Appeals Committee; Exhibit H, Transcript of August 17, 2002 Claude Bassett Appeal Hearing before the NCAA Infractions Appeals Committee; Exhibit I, Seven (7) CDs containing a recording of the January 4-5, 2001 Interview of Claude Bassett; and Exhibit J, June 24, 2002 Response to Appeal of Claude Bassett on behalf of the NCAA Division I Committee on Infractions.

16

such facts as would be admissible in evidence . . . ."); *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 927 (6th Cir. 1999) ("Hearsay evidence may not be considered on summary judgment."). In response, the NCAA contends that the Exhibits could be authenticated at trial by UK, SEC, and NCAA witnesses and that these exhibits would be admissible under the business records exception, Fed. R. Evid. 803(6).

But the Court need not address the parties' dispute over the exhibits because even if the Court were to ignore these exhibits, the NCAA would still meet its burden of establishing that there is an absence of evidence on a material fact on which Plaintiff has the ultimate burden of proof at trial. In his deposition testimony and his letter in response to the NCAA's official inquiry, exhibits to which Plaintiff offers no objection, Plaintiff admitted to violating several NCAA rules while serving as UK's assistant football coach. Plaintiff's burden in responding to the NCAA's summary judgment motion is to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial. As detailed in Section B, *supra*, however, Plaintiff has failed to meet that burden. Excluding the disputed exhibits would have no effect on the Court's conclusion; therefore, the Court will deny Plaintiff's motion to strike as moot.

**CONCLUSION**

Accordingly, and for the foregoing reasons, **IT IS ORDERED**:

(1) That the NCAA's motion for summary judgment [Record No. 95] be, and the same hereby is, **GRANTED**;

(2) That the NCAA's motion for a protective order [Record No. 86] be, and the same hereby is, **DENIED AS MOOT**; and

(3) That Plaintiff's motion to strike [Record No. 111] be, and the same hereby is, **DENIED AS MOOT**.

This the 11th day of May, 2006.



Signed By:
*Joseph M. Hood*
United States District Judge